## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEBRASKA

In Re:                                          Bankruptcy No. 18-81002-SKH

Nolan B. Balfour and Maegan L. Balfour,         Chapter 7

     Debtors.

_____/

First Nebraska Bank,

     Plaintiff,

v.                                              Adversary No. 18-8337-SKH

Nolan B. Balfour and Maegan L. Balfour,

     Defendant.

_____/

**ORDER**

## I.      INTRODUCTION

First Nebraska Bank ("Bank") filed a Complaint seeking denial of Debtors/ Defendants Nolan Balfour's and Maegan Balfour's discharge under 11 U.S.C. §§ 727(a)(2) and 727(a)(4). Alternatively, the Bank requests that the Balfours' debt to the Bank be excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B). In its Complaint, the Bank alleges the Balfours sold or transferred collateral that serves as security for debt to the Bank but did not submit the proceeds to the Bank, misrepresented their financial condition and intentionally provided the Bank incorrect financial information on which the Bank relied in making its lending decisions. The Balfours filed an Answer to the Complaint, denying they intentionally provided the Bank false information and denying that the Bank relied on information they provided in

1

making its lending decisions.  Defendants denied other allegations as well.  They seek

an order dismissing the Complaint.

## II.     FACTUAL FINDINGS

### A.     General Background

Nolan grew up in a family that farmed.  In 2008, Nolan started his own farming

operation.  He began by farming a few hundred acres of land under a crop share

arrangement using his grandfather's (Roger Balfour's) equipment.  In 2010, Nolan

began to rent land to grow crops.  To finance the land rent and other farming expenses,

Nolan secured financing from Heartland Community Bank in 2011 and 2012.

In 2012, Nolan and Maegan Balfour married.  Nolan assumed exclusive

responsibility for making decisions regarding the Balfours' farming operation.  Maegan

assisted with farming tasks such as moving trucks, "running the grain cart," and

vaccinating cattle when asked.  Although Maegan signed promissory notes, security

agreements and some financial statements at the Bank's request after the couple

married, she did not generate financial data for the Bank or provide financial information

to the Bank until after the Bank began to pursue liquidation of its collateral.  Maegan's

role in managing their family finances related to paying household or "everyday living"

expenses.  She played little or no role in their farm business financing.

### B.     The Balfours' Prebankruptcy Relationship with the Bank

In the fall of 2012, Nolan signed a five-year agreement to rent land.  To finance

the Balfours' expanding farming operation, Nolan submitted an application for a 2013

operating line of credit to Heartland Bank.  The Bank, successor to Heartland

Community Bank, granted the loan to the Balfours.  On March 4, 2013, the Balfours

executed and delivered a promissory note to the Bank in the original principal amount of

2

$1,160,000 (Note 1).[1]  Doc. 24.  Note 1 (also titled "Agricultural – Revolving Draw")

operated similarly to a line of credit.  Under the terms of Note 1, the Balfours requested

advances, which the Bank provided subject to the limitations and conditions provided in

the note.  Id.  The purpose of the note was to finance the Balfours' farming operation

from 2013 to 2017.  The Bank also granted the Balfours access to $3,000 per month

from the line of credit for a "living allowance."

        To secure Note 1, the Balfours signed Commercial Security Agreements granting

the Bank security interests in personal property and assets, including farm products

(such as livestock and crops), government payments and programs and "any and all

personal property . . . whether such property is now existing or hereafter created,

acquired or arising," including inventory, equipment, accounts and general intangibles.

See Docs. 27-32; Joint Stipulation of Uncontested Facts ¶ 12-16.  The Bank perfected

its security interests in these assets.  Docs. 33-41; Joint Stipulation of Uncontested

Facts ¶ 17-27.

        Although the term of Note 1 extended from March 4, 2013, to December 31,

2017, the Bank provided financing under this note on an annual basis.  According to

Lydell Woodbury, President and Chief Executive Officer of the Bank, Note 1 required

the Balfours to pay the sum advanced under the note in full at the end of each year or

provide verification to the Bank that they owned assets sufficient to pay the debt in full if

liquidated.  See Doc. 24.

---

[1] The United States Department of Agriculture Farm Service Agency ("FSA")
guaranteed 90% of the sum loaned under Note 1. Joint Stipulation of Uncontested Facts
¶ 28.

The general process the Bank used to decide whether to provide advances for the 2014, 2015, 2016 and 2017 operating seasons included a detailed review of the Balfours' financial information and meetings with Nolan about this information.[2]  It also conducted collateral inspections periodically.[3]

The financial information the Bank reviewed included a collateral analysis, cash flow statements, tax returns[4] and balance sheets.  It appears that the Bank generated the Balfours' balance sheets and cash flow statements by using data Nolan provided during the course of their financial relationship.  The Bank provided a copy of these statements to Nolan, and Nolan supplemented, deleted or revised some of this information.

Woodbury testified that Nolan and a loan officer began creating the Balfours' balance sheet in November and the parties often changed or supplemented it as late as April of the following year.  Woodbury explained that the balance sheet is a financial document which shows a "snapshot" of a farmer's operation at a specific date and time.  The Bank used market prices as part of this snapshot of the Balfours' farming operation.  Nolan maintained that the Bank often obtained these market prices from FSA

---

[2] Maegan did not attend these meetings.

[3] The Bank did not conduct collateral inspections every year.  In the years that it completed an inspection, it typically did so in the summer months.

[4] Nolan typically delivered the Balfours' tax returns to the Bank in March.  He maintained that the Bank used this information in compiling the Balfours' cash flow report.  William Patrick Connors, Ag Specialist/Vice President, testified he compared the Balfours' tax returns to their balance sheet to determine if the Balfours' expenses were appropriate and if their income was fairly consistent with what he expected it to be.

guidelines.[5]  The Bank also included information about the Balfours' debt to the Bank on

the Balfours' balance sheets and added debts to other banks and creditors.

Nolan provided some of the information included on the balance sheets,

including the number of bushels of grain and head of cattle.  The parties dispute the

extent of his contributions to some balance sheets, however.  After the balance sheets

were finalized, the Bank provided Nolan a copy of them.[6]  The Bank used the balance

sheets, cash flow statements, collateral analysis and inspection reports (if available) to

decide whether to extend credit to the Balfours for the following operating season.  The

Bank typically completed this analysis in March or April.  It did not advance funds on the

operating line of credit (which included the $3,000 per month living allowance) from

January until the date the Bank approved financing.[7]

Unlike in 2012 when Nolan's farm operation realized profit, the Balfours' farm

operation suffered a loss in 2013.  Nolan explained that the Balfours were committed to

---

[5] During the relevant time period, the FSA established guideline prices every year that it sent to banks.  Nolan claims the FSA prices were often higher than the prices he received for his grain.  He contends these higher prices inflated the Balfours' cash flow and balance sheet.  Nolan testified that the Bank ignored his concerns that the FSA numbers were unrealistic.  Woodbury agreed that the Bank used the FSA numbers unless the farmer "forward contracted grain" at a price above the FSA guidelines.  He claims, however, that the Bank did not use the FSA guideline prices for the Balfours' balance sheet; it only used them for their cash flow statement.  Nolan contends the Bank used the FSA prices on the balance sheet.

[6] Conners testified that he read the balance sheets to Nolan, line by line.

[7] The practice proved burdensome to the Balfours, who did not have access to a source of income between January and the date the Bank approved financing for the operating line of credit.  Nolan referred to his family's financial situation during this period as "dire straits."

an expensive long-term land rent agreement and commodity prices were substantially lower than in 2012.

Beginning in late 2013 and extending through the spring of 2014, Nolan and a Bank representative met to discuss the Balfours' financial condition and to create the Balfours' 2013 year-end balance sheet.  The Bank's analysis of the Balfours' 2013 financial information revealed that the Balfours did not possess sufficient grain inventory, livestock and other assets to either pay Note 1 in full or provide verification to the Bank that they owned collateral sufficient to pay the debt in full if liquidated.  To cover this loss and enable the Balfours to maintain their operating line of credit, the Bank agreed to loan the Balfours additional funds.

On January 29, 2014, Maegan and Nolan executed and delivered a Promissory Note titled "Agricultural – Single Advance" in the sum of $103,069.00 (Note 2).  Roger Balfour also signed Note 2.  The purpose of this note was "to refinance carryover debt." Doc. 25 at 2.  Note 2 provided a seven-year term, maturing on January 29, 2021.  Note 2 is secured by the same assets that serve as security for Note 1.  See Docs. 27-32; Joint Stipulation of Uncontested Facts ¶ 12-16; Ex. 33-41.  The Bank filed the documents necessary to perfect or maintain its secured status.

In the summer of 2014, the Bank inspected the collateral that secured the Balfours' debt.  During the collateral inspection, Nolan and a Bank representative drove around and looked at fields, machinery and livestock.  The inspection revealed collateral consistent with the representations on the Balfours' January 9, 2014, FYE 2013 Balance Sheet, signed February 6, 2014.  See Doc. 104.

In 2014, the Balfours suffered another operating loss due to high land rent and low commodity prices.  Per the parties' typical practice, Nolan met with a Bank representative at the beginning of 2015 to discuss the Balfours' 2014 financial information.  The Bank questioned the January 16, 2015, FYE 2014 Balance Sheet when a Bank representative found some discrepancies.  See Doc. 105.  At trial, Woodbury could not recall the specifics of the discrepancies.  When a Bank representative confronted Nolan about the inconsistency, "Nolan said he would check his records" and provide a response.  Woodbury testified that Nolan provided a reasonable response.  According to Woodbury, the Bank inspected its collateral at the Balfours' farm in 2015.  He testified that the 2015 collateral inspection was consistent with the 2014 year-end balance sheet.  The discrepancies were not reflected in this collateral inspection.

Crop year 2015 was no better for the Balfours than 2014.  According to Nolan, the Balfours suffered a $400,000 loss.  In the fall of 2015 or early 2016, the Bank suggested the Balfours had three options:  petition for bankruptcy relief under Chapter 12, allow the Bank to accelerate the notes and liquidate their assets, or borrow $300,000 from Roger Balfour to cover some or all of the annual losses.  Nolan opted for the third option, and Roger Balfour provided the funds to pay the Balfours' $300,000 debt.

To reduce the Balfours' financial burden, the Bank granted the Balfours a temporary reduction in interest rate.  In March of 2016, Nolan and Maegan signed a Promissory Note Modification Agreement that temporarily lowered the interest rate on

Note 1 from March 11, 2016, to December 31, 2016, after which the rate reverted to the original variable rate terms.  Ex. 26.

Also in 2015, the Bank questioned the Balfours' financial statements and voiced concern to Nolan about the Balfours' crop yield and grain inventory.  Nolan checked his records and provided adjustments.  The Bank did not question his representations.

In late 2015 or early 2016, William Patrick Connors, Ag Specialist/Vice President, assumed responsibility for monitoring and managing the Balfours' loan with the Bank. Connors questioned some of the figures on the balance sheet.  Specifically, Connors wondered why the Balfours held or stored so much grain from the previous year(s) compared to other farmers.  Connors also requested Nolan provide the Bank with copies of leases and contracts and copies of checks and settlement sheets after each grain delivery.

In the summer of 2016, the Bank inspected its collateral at the Balfours' farm. Nolan testified that Connors conducted the inspection and that Nolan showed Connors the Balfours' fields of growing grain, machinery and grain bins.  Nolan maintains that the grain bins he showed Connors stored only the Balfours' grain.  Connors did not "climb on those grain bins" to view the grain; he simply drove by them.

Connors also inspected the cattle by driving through the pasture where the cattle were located.  While the Bank did not obtain a highly accurate livestock count, there appeared to be no discrepancy between the 2015 year-end balance sheet and the 2016 collateral inspection.

Although Nolan worked a lot in 2016, both Nolan and Maegan worried that their farming operation was in jeopardy.  Nolan testified that, by the fall of 2016, he "knew it

was over with," suggesting that he knew the farm operation could not continue given the operating losses.

Nolan provided Connors with information the Bank compiled in the 2016 year-end balance sheet.[8]  Doc. 67.  Nolan claimed that the Balfours possessed 178,293 bushels of corn, 20,889 bushels of soybeans and 139 head of cattle.  He later admitted that these figures were overstated.  At trial, Nolan also admitted that he knew he needed to include assets on the Balfours' financial statements with a value sufficient to pay Note 1 if liquidated to be eligible for financing in 2017.

Despite Connor's continuing concern that the Balfours were holding or storing too much grain inventory, the Bank extended the Balfours' financing for crop year 2017.  In the summer of 2017, Connors conducted another inspection of the Bank's collateral.[9]  He did not find inconsistencies between the information on the balance sheet for year-end 2016 and the 2017 inspection.

The Bank did not discover discrepancies between the actual number of livestock and grain inventory and Nolan's representations on the January 10, 2017, FYE 2016 Balance Sheet until late 2017 or early 2018.  The information came to light during the loan renewal process.

The maturity date on Note 1 was December 31, 2017.  Doc. 24.  Although the Balfours had not repaid the advances released under Note 1, they sought to renew this line of credit for the 2018 crop year and perhaps other years as well.  According to

---

[8] Maegan did not sign the 2016 year-end balance sheet.  Doc. 67.

[9] Connors drove by the cattle and big machinery.  He also drove by most of the fields where the Balfours planted crops.  Connors did not inspect the Balfours' grain bins.  He believed Nolan's representations regarding stored grain.

Woodbury, the process to renew a line of credit is similar to the annual line of credit financing process.

Like previous years, Nolan provided information for the 2017 year-end balance sheet, including the number of livestock.  Nolan testified that by the time he provided this information, he "knew everything was awful and just threw numbers together to not have a confrontation."  He admitted that he intentionally provided inaccurate information to Connors to include on the 2017 year-end balance sheet.  For example, the 97 head of market livestock and 124 head of breeding stock totals he provided to the Bank were inaccurate.  See Doc. 68.  Neither Nolan nor Maegan signed this balance sheet.

As part of the renewal process, the Bank attempted to verify the Balfours' assets. This effort extended into 2018.  The Bank sent employees or contractors to inspect the Balfours' machinery and equipment and count their livestock.  While gathering this information, Connors learned that B&H Cattle owned some of the livestock the Balfours raised and possessed.[10]  According to Connors, Nolan never provided the Bank information about B&H Cattle or its interests in livestock, and Nolan never suggested that any of the assets on the Balfours' balance sheets were owned by third parties. Later, the Bank learned that Nolan also possessed cattle owned by the Balfours'

---

[10] B&H Cattle is a partnership between Nolan and Larry Hathaway, Maegan's father.  Doc. 75 at 7.  On the date of the Balfours' bankruptcy petition, the partnership owned approximately six to eight cow-calf pairs worth approximately $9,600.  Id.  B&H Cattle also owned other assets, including a birthing pen and feed, worth approximately $2,400.  Id.  The Balfours estimated that the total value of B&H Cattle's assets is approximately $12,000.  The partnership is indebted to First State Bank/Nehawka Bank (which holds a security interest in partnership assets) in the sum of $45,000.  The Balfours claim there is no equity in the partnership.

relatives.[11]  At trial, Connors suggested that Nolan included livestock owned by third

parties in the livestock numbers he provided to the Bank, representing them as his own.

During the asset verification process, the Bank also learned that Nolan sold grain

without remitting the $95,989.69 in proceeds to the Bank.  Specifically, Nolan sold grain

to Southwest Iowa Renewable Energy (SIRE) and Bunge North America, Inc., at

facilities in Council Bluffs, Iowa.  SIRE and Bunge issued checks payable to Nolan[12] for

the proceeds but did not include the Bank as a payee.  Exs. 49-57.  Nolan did not inform

the Bank of these sales or remit the proceeds to the Bank.  He claims he did not know

he was required to remit these checks to the Bank and unconvincingly suggests the

Bank should have known about them.[13]  Ultimately, Nolan agreed he should have

delivered these checks to the Bank to apply toward the Balfours' debt.

Nolan deposited nine of these grain proceeds checks in one of two accounts he

held at Nehawka Bank.[14]  The Balfours used these funds for home construction

---

[11] On the amended Statement of Financial Affairs filed September 4, 2018, the
Balfours represent that they held or controlled cattle owned by Hathaway and bulls
owned by Nancy Balfour, Nolan's mother. Doc. 77.

[12] Neither SIRE nor Bunge included Maegan as a payee on these checks.

[13] Nolan claims the Bank should have known that SIRE and Bunge issued
checks for grain proceeds payable only to Nolan because Nolan delivered checks from
SIRE and Bunge to Connors for other sales not included in the sum the Bank alleges
Nolan converted.  In fact, Nolan delivered the majority of grain proceeds checks issued
by Bunge and SIRE to the Bank.  Reportedly, none of these checks included the Bank
as a payee; Nolan was the sole payee.  Nolan contends that it would have been "fairly
obvious" to the Bank that the Bank's name was not on the checks he delivered.

[14] Nolan deposited two of the largest checks into a joint account with Maegan,
which they used to pay their home construction expenses.  Nolan deposited at least one
of these checks into a joint savings account with his father, Keith Balfour.  Ex. 88.

Nolan and Maegan offered an explanation for spending grain proceeds to pay
construction expenses, which they suggest justifies this conduct.  Specifically, Nolan

expenses, family living expenses and farm operating expenses, such as cattle feed.

Nolan admitted he was not authorized to spend the grain proceeds on personal

expenses like the construction of a new home.

At trial, Maegan conceded that she "kind of" understood that the proceeds of the

sale of grain and cattle were to be paid to the Bank.  She clarified her understanding by

stating:  "I mean it's common sense for grain but I didn't know about cattle."  Despite

this general understanding, Maegan testified that she believed that the Balfours were

free to spend proceeds from the sale of livestock or grain if the Bank's name was not

listed on the check for sale proceeds.  Maegan admitted that the Balfours used grain

proceeds to pay construction expenses and other general household living expenses,

such as food, Verizon bills and student loan payments.

A summary of these checks follows:

| When grain delivered | Where grain delivered | When check issued | Check number | Check Amount | When check deposited | Where check deposited |
|---|---|---|---|---|---|---|
| 9/29/14 | Bunge | 9/29/14 | #57168062 | $14,565.16 | | No specific evidence |
| 10/31/14 | Bunge | 10/31/14 | #57168933 | $4,215.26 | | No specific evidence |
| 11/6/14 | Bunge | 11/11/14 | #57169126 | $8,330.06 | | No specific evidence |
| 2/24/15 | SIRE | 2/24/15 | #5024 | $3,406.66 | | No specific evidence |
| 3/12/15 | SIRE | 3/12/15 | #5406 | $3,627.02 | | No specific evidence |
| 8/13/15 | SIRE | 8/13/15 | #010064 | $3,317.15 | | No specific evidence |

testified that the Balfours deposited $100,000 in proceeds from the sale of their previous
residence in 2013 or 2014 into this joint "construction account."  The couple intended to
use these funds to finance the construction of their house.  Contrary to this plan, Nolan
delivered these funds to the Bank to pay for part of the farm operation shortfall at the
end of 2015. Presumably Maegan did not consent to this payment.  Nolan testified that
Maegan was "not happy" and "had a lot of questions" when she learned that Nolan
spent the funds they intended to use to build their new home.

| 11/11/16 | SIRE | 11/18/16 | #021365 | $23,147.80 | 12/30/16 | Construction account |
| 3/21/17 | SIRE | 3/21/17 | #024623 | $22,065.87 | 3/23/17 | Construction account |
| 2/2/18 | SIRE | 2/2/18 | #043823 | $13,314.71[15] | 2/12/18 | Savings account |

As part of its asset verification process, the Bank hired Ronald Kenneth Lee, an adjuster for Great American Insurance Company who accepts independent contracts to measure grain.  The Bank retained Lee to verify the number of bushels in the Balfours' grain bins.  Lee estimated that the Balfours owned 58,803.40 bushels of corn and 850 bushels of beans stored "on the farm."  Doc. 66.  Although Nolan reportedly indicated to Lee that he owned approximately 23,360 bushels of corn stored at 4617 Van Dorn, Nolan later disputed this fact.  At trial, Nolan admitted that he might have stored grain in the bins at 4617 Van Dorn at some point, but he claimed he had not stored grain at that location for years.

The Bank compared the results of Lee's inspections to the Balfours' 2017 year-end balance sheet showing 237,138 bushels of (nonsilage) corn and 30,179 bushels of soybeans.  Doc. 68.  The discovery of these discrepancies prompted Connors to request a meeting with Nolan.

Nolan and Connors met on March 17, 2018.  During this meeting, Nolan told Connors that Nolan had been converting grain for two and a half to three years.  Joint Stipulation of Uncontested Facts ¶ 50.  Connors testified that Nolan admitted to selling grain under Roger Balfour's name.  Nolan stated that he converted grain to help Roger

---

[15] Nolan deposited only $12,314.71 of the $13,314.71 he received for grain proceeds into the savings account.  Nolan testified that check #043823 for $13,314.71 is the same deposit reflected by the $12,314.71 entry, and that it was possible that he withdrew $1,000 in cash.

Balfour and used the proceeds to pay people.  Joint Stipulation of Uncontested Facts ¶ 50.  Nolan also told Connors he thought he would probably go to jail.  Joint Stipulation of Uncontested Facts ¶ 50.

At trial, Nolan admitted that he sold grain and did not forward the nine checks listed above to the Bank, but he denied selling the Balfours' grain under Roger Balfour's name.  Nolan explained that he hauled some of his grandfather's grain to an elevator in early 2018 and informed the elevator that he was delivering grain for his grandfather.

On March 22, 2018, Nolan, Roger Balfour, Connors, Woodbury and other bank representatives met to discuss Nolan's admissions to Connors and the Balfours' financial situation.[16]  Woodbury told Nolan that "the first step would be for Nolan to visit with his wife and let her know what was going on."  Doc. 79.  "Nolan said that he had not done that yet, but that he would this afternoon."  Doc. 79.  As of March 23, 2018, the Balfours' outstanding debt to the Bank totaled $1,140,350.65.  Doc. 60.

On April 25, 2018, Connors and Mike Hansen[17] completed a "quick cattle inventory" which included traveling to three different sites with Nolan.  Connors recorded 110 head of livestock on a collateral inspection report.  Ex. 48.  Although Nolan signed the collateral inspection report, he claimed at trial that the information in the report is not true and accurate.  Joint Stipulation of Uncontested Facts ¶ 54.

---

[16] Maegan testified that she did not know about the meeting and that no one asked her to attend the meeting.

[17] Mike Hansen was Assistant Chief Credit Officer with the Bank at that time.

The Bank did not renew the Balfours' operating loan for the 2018 season. Due to a lack of financing, the Balfours did not farm in 2018. The Balfours defaulted on both Note 1 and Note 2.

After the Balfours defaulted on the promissory notes, they met with Bank representatives to discuss a liquidation plan. <u>See</u> Doc. 62. The Liquidation Plan as of June 14, 2018, prepared by a Bank representative, indicated that the Balfours possessed 29,865 bushels of corn, no beans, $212,100 in machinery and equipment and 93 head of cattle. Doc. 62. The Bank revised the liquidation plan twice to address third-party claims to some of the assets the Balfours possessed and to reflect a more accurate inventory of the Balfours' assets. Docs. 62-64. The Balfours did not complete the liquidation plan. Eventually, the Bank initiated a replevin action, prompting the Balfours to petition for bankruptcy relief. Nolan explained that he was concerned the Bank would take all the property the Balfours possessed even though third parties held an interest in some of the livestock.[18]

## C.    Bankruptcy

The Balfours filed an "emergency" joint petition for bankruptcy relief on July 12, 2018. Given the exigent nature of their petition, they did not file schedules until August 6, 2018, almost a month later. On Schedule B, the Balfours disclosed 17 head of

---

[18] On the amended Statement of Financial Affairs filed September 4, 2018, the Balfours represent that they held or controlled 12 head of cattle owned by Larry Hathaway and 2 breeding bulls owned by Nancy Balfour. Doc. 77. On their amended Schedule B, the Balfours disclosed Nolan's "½ interest in B&H Cattle," noting that B&H owned approximately six to eight cow-calf pairs. Ex. 75.

market cattle/feeders and 24 head of breeding cows valued at a total of $129,334.[19]

See Docs. 73, 75.  The Balfours disclosed grain proceeds, but they maintain they did not own grain on the date they petitioned for bankruptcy relief, except 505 bushels of 2017 grain stored at Midwest Farm Cooperative.   Nolan claimed he told the Bank about the grain stored at Midwest Farm Cooperative.

Further investigation prompted the Balfours to amend their statements and schedules on several occasions.  The Balfours did not revise the number of livestock or grain inventory on their amended schedules.

Several weeks after the Balfours petitioned for bankruptcy relief, the Bank filed a motion for relief from the automatic stay, seeking to repossess and liquate the Balfours' property that served as security for their debt to the Bank.  In September 2018, the Court granted the Bank's motion for relief from the automatic stay.  The Bank repossessed and sold the Balfours' machinery and equipment and 38 head of livestock. The Bank claims the Balfours owe it $870,711.41 on Note 1 as of March 20, 2019, and $79,430.57 on Note 2 as of March 20, 2019.  Docs. 71, 72.  The Bank submitted a loss claim to the FSA pursuant to its loan guarantee.  As of the date of trial, the Bank was still waiting for final disposition of its application.

The Bank argues the Balfours falsely represented the number of livestock on their bankruptcy schedules.  During the meeting of creditors and at trial, the Balfours testified that the schedules and statements they filed with the Bankruptcy Court were true and correct.  Joint Stipulation of Uncontested Facts ¶ 55.  When asked whether the

---

[19] At trial, Nolan admitted that the livestock value estimate the Balfours included on their schedules was high.  The Balfours' Counsel suggested that he was responsible for the high estimated value.

livestock count listed in their bankruptcy schedules was true and correct to the best of her knowledge, Maegan answered "I think so."  Nolan testified that he counted the livestock, "but not that closely."

The Bank also argues the Balfours should have disclosed grain inventory on their schedules.  The Balfours maintain they properly disclosed their interests in grain and grain proceeds.

## III.    CONCLUSIONS OF LAW

### A.    Jurisdiction

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(J).  The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and authority to enter a final order in this matter.  This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### B.    Denial of Discharge Standards

In the Complaint, the Bank seeks a denial of Nolan's and Maegan's discharge under 11 U.S.C. § 727(a)(2) and (a)(4).  Section 727 of the Bankruptcy Code provides:

(a) The court shall grant the debtor a discharge, unless . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A)  property of the debtor, within one year before the date of the filing of the petition; or

(B)  property of the estate, after the date of the filing of the petition;

* * *

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C. § 727(a).

Denying the debtor a discharge is a harsh remedy.  Home Serv. Oil Co. v. Cecil (In re Cecil), 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015).  Accordingly, courts strictly construe section 727 in favor of the debtor.  Id.  While this standard favors debtors, it is also true that a discharge in bankruptcy and the associated fresh start are privileges, not rights.  Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing Grogan v. Garner, 498 U.S. 279, 286 (1991)).  "The opportunity for a completely unencumbered new beginning is limited to the honest but unfortunate debtor."  Id.  The cost to the debtor for an unencumbered fresh start is minimal, but it includes honestly and accurately disclosing his or her financial affairs and cooperating with the trustee.  Id.; see 11 U.S.C. § 521 (listing a debtor's duties in bankruptcy).  "To prevail in an action to deny a debtor's discharge, the objecting party must prove each element under § 727 by a preponderance of the evidence."  Kaler v. Charles (In re Charles), 474 B.R. 680, 683–84 (B.A.P. 8th Cir. 2012) (citing Allred v. Vilhauer (In re Vilhauer), 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011)).

### 1.    Denial of Discharge Under 11 U.S.C. § 727(a)(2)

To prevail under section 727(a)(2)(A), the Bank must prove by a preponderance of the evidence: (1) Debtor's actions took place within one year before the petition date; (2) the act was that of Debtor; (3) the act amounted to a transfer, removal, destruction, mutilation or concealment of property; and (4) the act was done with an intent to hinder, delay or defraud a creditor or the Trustee.  See Georgen-Running v. Grimlie (In re

Grimlie), 439 B.R. 710, 716 n.11 (B.A.P. 8th Cir. 2010); Kaler v. Huynh (In re Huynh),

392 B.R. 802, 810 (Bankr. D.N.D. 2008).

Because a debtor rarely admits to fraudulent intent, a party seeking denial of

discharge must generally rely on a combination of circumstances, or "badges of fraud,"

that suggest the debtor harbored the necessary intent.   In re Huynh, 392 B.R. at 810.

The "badges of fraud" include:  (1) lack or inadequacy of consideration; (2) family,

friendship or other close relationship between the transferor and transferee; (3)

retention of possession, benefit or use of the property in question; (4) financial condition

of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's

property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8)

existence or cumulative effect of pattern or series of transactions or course of conduct

after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously

states it is bona fide; (10) debtor makes voluntary gift to family member; and (11)

general chronology of events and transactions under inquiry.  Id.  The list is not

exhaustive, and courts are free to consider "any other factors bearing upon the issue of

fraudulent intent."  Ritchie Capital Mgmt., LLC v. Stoebner, 779 F.3d 857, 863 (8th Cir.

2015) (in the context of a fraudulent transfer action under 11 U.S.C. § 548(a)(1)(A))[20]

---

[20] Recognizing the nearly identical wording of Code sections 522(o), 548(a)(1)(A)
and 727(a)(2), the Eighth Circuit Court of Appeals and numerous bankruptcy courts
apply the same standard of "intent to hinder, delay or defraud" a creditor to cases under
these sections.  See Addison v. Seaver (In re Addison), 540 F.3d 805, 811–12 (8th Cir.
2008); In re Sholdan, 218 B.R. 475, 481 (Bankr. D. Minn.1998), aff'd 217 F.3d 1006 (8th
Cir. 2000) (citing cases) ("The Eighth Circuit has approved the use of the same
inferential process in applying the statutory language 'with intent to hinder, delay or
defraud creditors,' wherever that language is found—in state fraudulent-transfer
statutes, 11 U.S.C. § 548(a), or 11 U.S.C. § 727(a)(2)").  This standard includes the
badges of fraud analysis.  In re Addison, 540 F.3d at 811–12; Dantzler v. Zulpo (In re
Zulpo), 592 B.R. 231, 247 (Bankr. E.D. Ark. 2018) ("Courts have applied the inferential

(quoting Jensen v. Dietz (In re Sholdan), 217 F.3d 1006, 1009–10 (8th Cir. 2000));

Dunker v. Bachman (In re Bachman), 2017 WL 3098093, at * 4 (Bankr. D. Neb. July 20,

2017).

The presence of a single badge is typically not sufficient to establish actual

fraudulent intent.  Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1354 (8th

Cir. 1995).  The confluence of several badges, however, creates a presumption of

fraudulent intent.  Ritchie Capital Mgmt., 779 F.3d at 861–62; Kelly v. Armstrong, 141

F.3d 799, 802 (8th Cir. 1998); Dantzler v. Zulpo (In re Zulpo), 592 B.R. 231, 247 (Bankr.

E.D. Ark. 2018); see also Rademacher v. Rademacher (In re Rademacher), 549 B.R.

889, 894 (Bankr. E.D. Mo. 2016) (noting that the presence of more than one badge of

fraud "strongly indicates that the debtor did, in fact, possess the requisite intent.").

### a.    **Nolan Balfour**

The Bank offered evidence that, within one year before the Balfours petitioned for

bankruptcy relief, Nolan sold grain that served as collateral for debt to the Bank,

deposited the funds in an account to which the Bank had no access and spent the grain

proceeds knowing that his agreements with the Bank required that he remit the

proceeds to the Bank.  Specifically, Nolan sold grain to SIRE on or about February 2,

2018, received a check for $13,314.71 listing Nolan as the only payee and deposited

this check in the Nehawka Bank account he shared with his father.[21]  The savings

account statement as well as testimony at trial confirm that Nolan spent the grain

---

'badges of fraud' approach to determine whether a debtor acted with fraudulent intent,
regardless of which of these provisions is being construed.")

[21] Nolan deposited the eight other checks he received from SIRE and Bunge
more than one year before the Balfours petitioned for bankruptcy relief.

proceeds on a student loan payment and credit card payments, which Maegan and

Nolan testified related to household or living expenses.  Nolan's act of depositing the

grain proceeds in a joint checking account with his father and then spending the funds

are transfers under section 727(a)(2).[22]  Nolan also concealed this deposit from the

Bank by depositing the funds in the joint savings account with his father rather than the

Balfours' account with the Bank.  Accordingly, the Bank established the first three

elements of its section 727(a)(2) cause of action.

The more difficult question is whether Nolan transferred $13,314.71 in grain

proceeds with intent to hinder, delay or defraud the Bank.  The Bank established that

Nolan's transfer of $13,314.71 in grain proceeds to a joint account with his father to

which the Bank had no access without the knowledge or consent of the Bank and his

subsequent transfer to other creditors was not an isolated incident.  In its closing

argument, the Bank highlighted evidence showing that Nolan failed to deliver to the

Bank a total of nine checks for grain proceeds which served as security for debt to the

Bank.  It also established that Nolan and Maegan spent the proceeds on home

construction and other personal expenses.  Accordingly, the Bank offered evidence

---

[22] See Rose v. Reaves (In re Rose), 574 B.R. 141, 150–51 (D. Ariz. 2017)
(finding that the debtor's transfer of funds to an account in the name of a non-debtor
third party beyond the reach of the debtor's creditors was a disposition by transfer under
section 727(a)(2)(A) and that the debtor's payment of attorneys, accountants and other
creditors from this account was a second transfer under section 727(a)(2)(A)); Freelife
Int'l, LLC v. Butler (In re Butler), 377 B.R. 895, 917–18 (Bankr. D. Utah 2006) (defining
transfer under section 727(a)(2) as "any disposition of an interest in property which
includes a transfer of possession, custody, or control even if there is no transfer of title
and which also includes deposits to, withdrawals from, and transfers between bank
accounts or similar accounts"); James v. Tipler (In re Tipler), 360 B.R. 333, 341 (Bankr.
N.D. Fla. 2005) (finding the debtor's deposit of $120,000 into a joint account with his
wife was a transfer under section 727(a)(2)).

showing several badges of fraud, including family relationship between the transferor

and transferee; retention of benefit or use of the property in question; financial condition

of the transferor prior to and after the transaction; secrecy of the conveyance; existence

or cumulative effect of pattern or series of transactions or course of conduct; voluntary

gift to family member; and general chronology of events and transactions under inquiry.

See In re Huynh, 392 B.R. at 810.  Based on all these circumstances and badges of

fraud, the Court finds the Bank offered evidence sufficient to create a presumption of

fraudulent intent.  See Ritchie Capital Mgmt., 779 F.3d at 861–62; In re Zulpo, 592 B.R.

at 247.

        To rebut the presumption, the Balfours argue that Nolan used some of the grain

proceeds during the spring when the Bank had not yet decided whether it would fund an

operating line of credit for the Balfours.  Nolan testified that the Balfours did not have

access to the $3,000 monthly advance from the operating line of credit for family living

expenses between January and the date the Bank approved financing for the operating

line of credit, which was typically in March or April after the parties finalized the balance

sheet.  The Balfours claim "[i]t was out of necessity that Defendant Nolan Balfour

converted grain proceeds to his own name."  Doc. 126 at 2.

        The Court is not persuaded by this argument for several reasons.  First, while

Nolan testified that his family was in "dire straits" in the months before the Bank

approved the Balfours operating loan, he did not testify that he had no source of income

available in February 2018 when Nolan cashed the $13,314.71 check for grain

proceeds.  In fact, he did not specifically testify that any of the checks he converted

were "out of necessity."  Second, more than half of the checks Nolan concealed and

transferred to joint accounts for personal use were cashed in August through

November, when the $3,000 per month family allowance was available to the Balfours.

Finally, the Balfours' use of the grain proceeds to pay household expenses rather than

the Bank does not negate Nolan's intent to hinder, delay or defraud the Bank. See

Rose v. Reaves (In re Rose), 574 B.R. 141, 153 (D. Ariz. 2017) (finding that withholding

funds from one creditor to pay another does not "absolve the debtor" of a § 727(a)(2)

violation) (citing Locke v. Schafer, (In re Schafer), 294 B.R. 126, 131 (N.D. Cal. 2003)).

The Bank also devoted much of its closing argument to summarizing substantial

discrepancies between the grain inventory and livestock Nolan represented the Balfours

owned in 2017 and 2018 and the actual grain inventory and livestock the Balfours

owned. While the Court is not convinced that the Bank established that the Balfours

transferred or concealed grain or livestock (other than the nine grain proceeds checks

previously discussed),[23] Nolan's failure to explain the asset discrepancies and his

---

[23] Evidence received at trial shows that 2013, 2014 and 2015 end-of-year
balance sheets reflected no discrepancies, and the Bank granted the Balfours access to
the operating line of credit for operating years 2014, 2015 and 2016. While the Bank
conducted collateral inspections on several occasions, it did not inspect the inside of the
grain bins where the Balfours stored their grain, and it did not arrange for anyone to
measure the grain until the spring of 2018. It offered no evidence of a specific transfer,
removal, destruction or mutilation of grain (other than the nine grain proceeds checks
summarized above). It argues that Nolan must have transferred the remaining grain
and concealed these transfers because Bank employees who inspected their collateral
did not find it. Essentially, it is asking the Court to infer that Nolan transferred or
concealed the grain. While it is possible that Nolan transferred, removed, destroyed
and/or concealed grain, it is equally possible that Nolan misrepresented the number of
bushels he stored. In other words, it is possible (arguably more likely) that the "missing
grain" never existed. The evidence the Bank offered regarding discrepancies between
grain inventory Nolan reported on the Balfours' balance sheets and the actual grain
inventory the Bank found in its inspection of the Balfours' grain bins and analysis of the
grain proceeds it discovered is not sufficient to prove Nolan transferred or concealed
grain. Under these circumstances, the Court declines to infer that Nolan transferred or
concealed the grain.

misrepresentations regarding the Balfours' assets provide further support for the Bank's assertion that Nolan intended to hinder, delay and defraud the bank by selling the Bank's collateral and using the proceeds for personal expenses.

Accordingly, the Court finds that the Bank met its burden of showing that Nolan transferred, concealed and spent grain proceeds which served as security for debt to the Bank with intent to hinder, delay or defraud the Bank.  The Balfours failed to offer evidence sufficient to rebut the presumption.  Accordingly, the Bank met all of the elements of its section 727(a)(2) cause of action.  Nolan's discharge is denied under 11 U.S.C. § 727(a)(2).

---

Similar to the alleged transfer or concealment of grain, the Bank established a large discrepancy between the 221 head of livestock Nolan reported to the Bank for the January 10, 2018, FYE 2017 balance sheet, the 109-110 cattle reported on the April 2018 Agricultural Collateral Inspection Report Nolan signed and the 38 head of livestock the Bank ultimately repossessed and sold on October 6, 2018.  Nolan admitted that the livestock numbers he provided the Bank for the 2017 year-end balance sheet were exaggerated.  Similarly, Nolan maintains that the collateral inspection report does not reflect the number of cattle the Balfours actually owned.  Both Connors and Nolan testified that that the livestock inspection did not result in a completely accurate count.  Additionally, the Balfours offered evidence that B&H Cattle and the Balfours' relatives owned some of the livestock in their possession during the Spring of 2018.  The Bank maintains that, even if the Court subtracts the livestock owned by third parties, there is a "substantial" discrepancy between 109-110 head of livestock listed on the collateral inspection report and the actual number of livestock the bank liquidated—approximately 43 to 46 head.  While the Bank established that the Balfours offered no explanation or accounting for 43 to 46 head of livestock, it offered no evidence of a specific transfer, removal, destruction, mutilation or concealment of livestock.  The imprecise inspection together with Nolan's repeated admissions that he exaggerated livestock numbers and grain inventory make it plausible that the Balfours never actually owned as many head of livestock as Nolan claimed.  The Court declines to infer Nolan concealed or transferred livestock without evidence of this conduct.  Accordingly, the Bank failed to meet its burden of showing, by a preponderance of the evidence, that Nolan transferred, removed or concealed livestock with intent to hinder, delay and defraud the Bank.

b.    **Maegan Balfour**

To meet its burden under section 727(a)(2), the Bank must show that Maegan

transferred, removed, destroyed, mutilated, or concealed property.  It may not rely

solely on Nolan's conduct to deny Maegan a discharge simply because she is Nolan's

spouse and jointly obligated to pay the Balfours' debt to the Bank.  Her conduct is

analyzed separately under section 727.[24]

The Bank offered no evidence that Maegan transferred, removed, destroyed,

mutilated, or concealed property with intent to hinder, delay or defraud the Bank.

Rather, the evidence shows that Nolan assumed exclusive responsibility for making

decisions regarding the Balfours' farming operation.  Although Maegan signed

promissory notes, security agreements and some financial statements, she did not

generate financial data for the Bank or provide financial information to the Bank until

after the Bank began to pursue liquidation of its collateral.  Maegan did not attend

meetings with Bank representatives until after the Bank discovered Nolan's

---

[24] See Jordan v. Bren (In re Bren), 122 F. App'x 285 (8th Cir. 2005)
(unpublished) (finding the husband acted recklessly, and therefore with intent to
defraud, when he "persisted in such a high degree of ignorance" about his financial
affairs, but finding the wife had no role in the financials "aside from signing checks" and
thus lacked intent to defraud); Bank of Bennington v. Thomas (In re Thomas), 431 B.R.
468 (B.A.P. 8th Cir. 2010) (affirming the bankruptcy court's finding that the husband's
"reckless and sizeable omissions" showed his fraudulent intent and its finding that the
court had insufficient evidence regarding his wife's "knowledge and understanding of
the dates on which certain settlement monies were received and transferred and no
evidence concerning her knowledge of" checks her husband received); Smith v. Cooper
(In re Cooper), 399 B.R. 637, 647 (Bankr. E.D. Ark. 2009) (explaining "more than the
marital relationship is necessary to impute fraudulent intent between spouses so
discharge will be denied. As one court has observed, the sins of one spouse are not
automatically visited upon the other" (internal citations omitted)); see also Gannet v.
Carp (In re Carp), 340 F.3d 15, 26 (1st Cir. 2003) (same).

misrepresentations.  She did not sell the grain the Bank claims the Balfours converted, and she was not listed as payee on grain proceeds checks.  There is no evidence that she transferred property that serves as security for debt to the Bank.  While the Bank offered evidence that Maegan knew that Nolan deposited a number of grain proceeds checks into a joint account with her, and the Balfours spent these proceeds on home construction expenses, most of these deposits took place more than a year before the Balfours petitioned for bankruptcy relief and are not actionable under section 727(a)(2).  Likewise, the Bank established that Maegan knew that Nolan deposited the February 2, 2018, $13,314.71 grain proceeds check from SIRE in the joint savings account with his father and then withdrew or spent some of these funds on household living expenses, but the Bank did not offer evidence that she was complicit in these transactions or that she conspired to hinder, delay or defraud the Bank.  At most, it established that Maegen knew the source of the funds, knew Nolan used the money for credit card bills and other household expenses and did not report it to the Bank.  This evidence is not sufficient to deny her a discharge under section 727(a)(2).  In re Towe, 147 B.R. 545, 551 (Bankr. D. Mont. 1992), aff'd sub nom. United States v. Towe (D. Mont. Nov. 22, 1994), aff'd sub nom. In re Towe, 97 F.3d 1461 (9th Cir. 1996) ("fraudulent intent under section 523(a)(2) or under section 727(a)(2) cannot be imputed from the mere fact that a wife derived benefit from her husband's conduct, or even that she had knowledge of his misconduct") (citation omitted).

## 2.   Denial of Discharge Under 11 U.S.C. § 727(a)(4)

The Bankruptcy Code bars the entry of discharge if a debtor knowingly and fraudulently made a false oath or account in or in connection with a bankruptcy case.

11 U.S.C. § 727(a)(4)(A).  To meet its burden under this subsection, the Bank must

prove, by a preponderance of the evidence:  (1) Nolan and Maegan made a statement

under oath; (2) the statement was false; (3) they knew the statement was false; (4) they

made the statement with fraudulent intent; and (5) the statement materially related to

the Balfours' bankruptcy case.  In re Cecil, 542 B.R. at 451 (citation omitted).  Section

727(a)(4)(A), "requires nothing less than a full and complete disclosure of any and all

apparent interests of any kind."  Korte v. U.S. Internal Revenue Serv. (In re Korte), 262

B.R. 464, 474 (B.A.P. 8th Cir. 2001) (citations omitted); Armstrong v. Lunday (In re

Lunday), 100 B.R. 502, 508 (Bankr. D.N.D. 1989) ("A debtor has an uncompromising

duty to disclose whatever ownership interest he holds in property.").  "The debtor's duty

of disclosure requires updating schedules as soon as reasonably practical after he or

she becomes aware of any inaccuracies or omissions."  In re Bauer, 298 B.R. at 357.

The proper functioning of the bankruptcy process depends upon the debtor

providing complete, accurate and reliable information in the petition and other

documents submitted with the petition so that parties in interest may evaluate a debtor's

assets and liabilities and appropriately administer the case.  Jordan v. Bren (In re Bren),

303 B.R. 610, 613–16 (B.A.P. 8th Cir. 2004), overruled on other grounds by 122 F.

App'x 285 (8th Cir. 2005).  Section 727(a)(4)(A) promotes veracity in the statements

and schedules to prevent creditors and the trustee from resorting to independent fact-

finding and investigation.  Daniel v. Boyd (In re Boyd), 347 B.R. 349, 355 (Bankr. W.D.

Ark. 2006).  The disclosure requirement has implications beyond the administration of

each individual bankruptcy case because "failure to comply with the requirements of

disclosure and veracity necessarily affects the creditors, the application of the

Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole." Nat'l Am. Ins. Co. v. Guajardo (In re Guajardo), 215 B.R. 739, 742 (Bankr. W.D. Ark. 1997).

"Grounds for the denial of a discharge do not exist where a debtor completes his bankruptcy papers to the best of his abilities and attempts to be complete and accurate." Walton v. Wheaton (In re Wheaton), 474 B.R. 287, 291 (Bankr. M.D. Fla. 2012). While courts are often understanding of a single omission or error resulting from an innocent mistake, multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth which is the functional equivalent of intent to deceive. Kaler v. Geller (In re Geller), 314 B.R. 800, 807 (Bankr. D.N.D. 2004) (citing In re Bren, 303 B.R. at 613); Golden Star Tire, Inc. v. Smith (In re Smith), 161 B.R. 989, 992 (Bankr. E.D. Ark. 1993). "[T]he existence of multiple falsehoods, taken together with a failure on the part of the debtor to correct all known inconsistencies, omissions, and misstatements upon first amendment, constitutes reckless indifference to the truth and, thus, the requisite intent to deceive." Kaler v. McLaren (In re McLaren), 236 B.R. 882, 895 (Bankr. D.N.D. 1999) (citations omitted). The same rationale extends to initial filings in which a debtor makes statements that exceed honest mistakes and are inconsistent and incompatible with the debtor's own knowledge and information. Id. at 894–95 (noting that the "price" for relief under the Bankruptcy Code is "the debtor's utmost honesty and candor in all dealings with the Court").

The Bank argues that information included in the Balfours' bankruptcy schedules is not accurate. Specifically, the Bank alleges that the Balfours represented that they "did not own any grain," when their financial statements suggest that they "should have

had, at a minimum, 7,457.33 bushels of corn." Doc. 124 at 24. The Bank also asserts

that the Balfours represented that they "owned 41 head of livestock" when the Bank

recovered only 38 head of livestock. Doc. 124 at 24. The Bank claims the Balfours

knowingly made these false statements with intent to defraud the Bank. Doc. 1.

> a.   Statement under Oath

A debtor's signature on the petition, made under penalty of perjury, is a

declaration which has the force and effect of an oath of the kind contemplated by

section 727(a)(4)(A). In re Bren, 303 B.R. at 613; Cepelak v. Sears (In re Sears), 246

B.R. 341, 347 (B.A.P. 8th Cir. 2000) (citation omitted). Nolan and Maegan signed the

bankruptcy petition and testified at the first meeting of creditors and at trial that the

information in their statements and schedules was true and correct. Accordingly, the

Court finds that the information in their schedules and statements are "statements under

oath." The Bank satisfied its burden of proof under the first element of section

727(a)(4). See Lincoln Sav. Bank v. Freese (In re Freese), 460 B.R. 733, 738-39

(B.A.P. 8th Cir. 2011).

> b.   False Statement

The Balfours did not list grain inventory on their original and amended Schedule

B. The Bank alleges this is a false representation because "the Balfours should have

had, at a minimum, 7,457.33 bushels of corn remaining on farm, and more likely should

have had 30,817.33 bushels of corn on farm when they filed bankruptcy." Doc. 124 at

24. The Bank offered no evidence that the Balfours owned grain they did not disclose.

Rather, they rely on the Balfours' failure to explain the discrepancy between the

Balfours' representations on financial statements and their representations on

bankruptcy schedules.  This discrepancy is not sufficient to prove a claim under section

727(a)(4) of the Bankruptcy Code under the circumstances of this case without

evidence that the Balfours still owned grain.[25]

The Bank also claims that the livestock number the Balfours listed on their

schedules is incorrect.  On the amended Schedule B, the Balfours listed 41 head of

livestock.  After the Court granted relief from the automatic stay, the Bank took

possession of 38 head of livestock. The Bank alleges that "the Baflours presented no

credible evidence at trial about what happened to the additional missing livestock."

Doc. 124.

At trial, Nolan denied selling livestock after the Balfours petitioned for bankruptcy

relief.  Consequently, it appears that the Balfours disclosed three more head of livestock

than they actually owned.  Maegan and Nolan testified that they counted their livestock.

Maegan testified that she thought the livestock number was correct to the best of her

knowledge.  Nolan testified that he counted the livestock, "but not that closely."   Based

on the Balfours' testimony, they were not confident that their livestock count was

accurate.  Consequently, the Bank established that the number of livestock listed on the

Balfours' Schedule B is incorrect.

> c.   <u>Statement Debtor Knew Was False Made with Fraudulent Intent</u>

The Court is not convinced, however, that the Balfours knew this number was

incorrect when they listed it or that they listed a higher number on their schedules than

they actually owned with fraudulent intent.  Given the testimony from both parties

---

[25] Naturally, the Bankruptcy Code does not excuse a debtor from failing to satisfactorily explain any loss of assets or deficiency of assets to meet his or her liabilities (<u>see</u> 11 U.S.C. § 727(a)(5)), but that issue is not before the Court.

regarding how difficult it is to accurately count cattle in a pasture, it appears that missing

one, two or even three head is possible.  Although Nolan admitted to selling livestock

and keeping the proceeds on several occasions in 2014-2018 and to providing the Bank

incorrect information regarding the Balfours' assets in 2017 and early 2018, the Bank

offered no evidence that either Nolan or Maegan intentionally misrepresented their

assets on or after the date they petitioned for bankruptcy relief.  By July 2018, the Bank

investigated and discovered an accurate profile of the Balfours' financial distress.  The

evidence shows that both Nolan and Maegan were worried about the Bank

repossessing property owned by third parties in June through September 2018, but

Nolan testified that the Balfours were willing to turnover the property they owned.  The

Bank did not offer evidence sufficient to show fraudulent intent.  Accordingly, the Bank

did not meet its burden of proving its claims under section 727(a)(4).

### C.    Debts Excepted from Discharge Under 11 U.S.C. § 523

The Bank also seeks an order and judgment excepting its debt from discharge

under 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B).  Section 523 provides that a debt is

excepted from discharge:

> (2) for money, property, services, or an extension, renewal, or refinancing
> of credit, to the extent obtained, by—
>
> > (A) false pretenses, a false representation, or actual fraud, other than
> > a statement respecting the debtor's or an insider's financial condition;
>
> > (B) use of a statement in writing—
>
> > > (i) that is materially false;
> > >
> > > (ii) respecting the debtor's or an insider's financial condition;
> > >
> > > (iii) on which the creditor to whom the debtor is liable for such
> > > money, property, services, or credit reasonably relied; and

> (iv) that the debtor caused to be made or published with intent to deceive;

11 U.S.C. § 523(a)(2).  The Bank must prove each element of a section 523
nondischargeability claim by a preponderance of the evidence.  Northland Nat'l Bank v.
Lindsey (In re Lindsey), 443 B.R. 808, 812 (B.A.P. 8th Cir. 2011) (citing Grogan, 498
U.S. at 286–91).  Exceptions to discharge are narrowly construed to effectuate the
"fresh start" of the Bankruptcy Code.  Cmty. Fin. Grp., Inc. v. Fields (In re Fields), 510
B.R. 227, 233 (B.A.P. 8th Cir. 2014) (citation omitted).

### a.    Nolan Balfour

Since the Court denied Nolan's discharge under section 727, it is not necessary
to analyze the Bank's section 523 claims against Nolan.

### b.    Maegan Balfour

#### 1.    Maegan's Debt to the Bank is Not Excepted from Discharge Under 11 U.S.C. § 523(a)(2)(B).

The Bank seeks an order and judgment excepting Maegan's debt to it from
discharge under 11 U.S.C. § 523(a)(2)(B).  To meet its burden under section
523(a)(2)(B), the Bank must prove that Maegan obtained money by (1) use of a
statement in writing that was materially false; (2) that pertained to his or her business's
financial condition; (3) on which the plaintiff reasonably relied; and (4) that the debtor
made with the intent to deceive the plaintiff.  Bank of Neb. v. Rose (In re Rose), 483
B.R. 540, 543–44 (B.A.P. 8th Cir. 2012).

The Bank did not meet its burden of proving its claim under section 523(a)(2)(B)
against Maegan.  Specifically, it failed to show that Maegan prepared and delivered a
materially false written statement to the Bank.  Nolan was the only Debtor who signed
the January 10, 2017, FYE 2016 Balance Sheet.  The evidence confirms that he

provided the data included on the Balance Sheet and only Nolan met with Bank representatives to discuss it.  Maegan did not generate financial data for the Bank or provide financial information to the Bank until after the Bank began to pursue liquidation of its collateral.  Accordingly, the Bank's cause of action against Maegan under section 523(a)(2)(B) is dismissed.

### 2.   Maegan's Debt to the Bank is Not Excepted from Discharge under 11 U.S.C. § 523(a)(2)(A)

The Bank also asserts that Maegan's debt to it should be excepted from discharge under section 523(a)(2)(A) because the Balfours obtained money, property, services, or an extension or renewal of credit by false representations and actual fraud. As to the Balfours' allegedly false representations, sections 523(a)(2)(A) and (a)(2)(B) are mutually exclusive. Land Inv. Club, Inc. v. Lauer (In re Lauer), 371 F.3d 406, 413 (8th Cir. 2004) (citing First Nat'l Bank of Olathe v. Pontow, 111 F.3d 604, 608 (8th Cir. 1997)); Willmar Elec. Serv. Corp. v. Dailey (In re Dailey), 592 B.R. 341, 348 (D. Neb. 2018), appeal dismissed (Jan. 30, 2019).  An interested party may elect to bring a claim under section (a)(2)(B) if the allegedly fraudulent statements respect a debtor's financial condition or under section (a)(2)(A) if they do not respect a debtor's financial condition. See In re Dailey, 592 B.R. at 348.  In this case, all of the allegedly fraudulent statements the Bank claims the Balfours made to it pertain to the Balfours' net worth, overall financial health or ability to generate income, including Nolan's representations regarding grain inventory and livestock.  These claims are not actionable under section 523(a)(2)(A). Id.

To the extent the Bank claims that the Balfours obtained proceeds from the sale of grain, deposited the proceeds in an account to which the Bank had no access and

spent these funds without receiving the Bank's authorization to do so—depriving the

Bank of its interest in these proceeds—this claim arguably falls within the scope of

section 523(a)(2)(A).  In a 2016 decision, the United States Supreme Court found that

the definition of "actual fraud" in the context of section 523(a)(2)(A) encompasses fraud

that does not involve a misrepresentation from a debtor to a creditor, such as a

fraudulent conveyance scheme.  Husky Int'l Elec., Inc. v. Ritz, 136 S. Ct. 1581 (2016).

It explained:

> "Actual fraud" has two parts: actual and fraud. The word "actual" has
> a simple meaning in the context of common-law fraud: It denotes any fraud
> that "involv[es] moral turpitude or intentional wrong." Neal v. Clark, 95 U.S.
> 704, 709, 24 L. Ed. 586 (1878). "Actual" fraud stands in contrast to "implied"
> fraud or fraud "in law," which describe acts of deception that "may exist
> without the imputation of bad faith or immorality." Ibid. Thus, anything that
> counts as "fraud" and is done with wrongful intent is "actual fraud."

Id. at 1586; see Hasley v. Irons (In re Irons), 2017 WL 943897, at *3 (citing this

definition).  Although the Supreme Court did not adopt a specific definition of the "fraud"

component of "actual fraud" in Husky, it acknowledged that fraud "connotes deception

or trickery." Husky, 136 S. Ct. at 1586.  Accordingly, the Bank must show the

Balfours—more specifically, Maegan—committed fraud with wrongful intent to prevail

under the "actual fraud" component of section 523(a)(2)(A).

The evidence shows that Nolan sold grain, received nine checks totaling

$95,989.69 from SIRE or Bunge listing his name as the sole payee and deposited these

checks in accounts to which the Bank had no access.  Although the Bank established

that Nolan deprived the Bank of its interest in the grain proceeds with wrongful intent

and specific acts to transfer and conceal these grain proceeds, this evidence is not

sufficient to show Maegan is liable for actual fraud under section 523(a)(2)(A).

To meet its burden of showing that Maegan's debt to the Bank is excepted from

discharged under section 523(a)(2)(A), the Bank must show that Maegan defrauded the

Bank, that she authorized Nolan's conduct as her agent or that she was Nolan's partner

in their farm operation and knew or should have known of Nolan's fraud.  See Treadwell

v. Glenstone Lodge, Inc. (In re Treadwell), 637 F.3d 855, 860 (8th Cir. 2011).[26]

The evidence shows that Nolan and Maegan both entered into the loan

agreements with the Bank.  Maegan understood that these agreements required that all

proceeds from the sale of grain must be paid to the Bank, but she testified that she

believed that the Balfours were free to spend proceeds from the sale of livestock or

grain if the Bank's name was not listed on the check for sale proceeds.[27]  Maegan

---

[26] The Eighth Circuit Court of Appeals in In re Treadwell observed,

> If the creditor proves a partnership between two of its debtors, non-dischargeability may be imputed from one partner to the other. See Strang v. Bradner, 114 U.S. 555, 561, 5 S.Ct. 1038, 29 L.Ed. 248 (1885). Under our precedent, imputation only is proper if the otherwise innocent debtor knew or should have known of his partner's fraud. See Walker v. Citizens State Bank of Maryville, Mo. (In re Walker), 726 F.2d 452, 454 (8th Cir.1984) (per curiam). Reckless indifference is evidence the innocent debtor should have known of the fraud. See id.

In re Treadwell, 637 F.3d 855, 860 (8th Cir. 2011) (footnoted omitted); see also In re Reuter, 686 F.3d 511, 518 (8th Cir. 2012) ("We have required at least recklessness on the part of a debtor to whom a partner's fraud is imputed in order to render such a debt non-dischargeable under § 523(a)(2)(A)." (citing Walker v. Citizens State Bank of Maryville, (In re Walker), 726 F.2d 452, 454 (8th Cir.1984) (per curiam) ("If the debtor was recklessly indifferent to the acts of his agent, then the fraud may also be attributable to the debtor-principal [for purposes of discharge under § 523(a)(2)(A) ].")); R & R Ready Mix v. Freier, (In re Freier), 604 F.3d 583, 587 (8th Cir. 2010) (noting that a creditor must show "1. The debtor made a representation," among other elements to prove its claim under section 523(a)(2)(A)).

[27] Although this explanation is suspicious, the Bank offered no other evidence of Maegan's intent.  She did not make false representations regarding the Balfours'

admitted that the Balfours used proceeds from the sale of grain to pay construction expenses and other general household living expenses, such as food, Verizon bills and student loan payments.  While the Bank offered evidence that Maegan knew that Nolan deposited a number of grain proceeds checks into accounts to which the Bank had no access and spent these proceeds, the Bank did not offer evidence that she was complicit in these transactions or that she intended to defraud the Bank.  Nolan assumed exclusive responsibility for making decisions regarding the Balfours' farming operation.  Maegan did not sell the grain the Bank claims the Balfours converted, and she was not listed as payee on grain proceeds checks.  The Bank did not argue or offer evidence that Nolan was acting as Maegan's agent during these transactions or that she granted him authorization to sell grain out of trust.  At most, it established that Maegen knew the source of the checks, knew Nolan used the money for credit card bills and other household expenses and did not report it to the Bank.  This evidence is not sufficient to prove actual fraud under section 523(a)(2)(A).

The Court considered all other arguments and finds them unpersuasive or unnecessary to discuss.

## IV.    CONCLUSION

For the reasons stated above, the Bank met its burden of proving Nolan transferred the Balfours' property, within one year of bankruptcy, with intent to hinder, delay, or defraud a creditor.  Nolan's discharge is denied under 11 U.S.C. § 727(a)(2).

---

assets, mislead the Bank during collateral inspections or otherwise participate in the large majority of misdeeds the Bank accuses Nolan of committing.

The Bank did not satisfy its burden of proving Maegan transferred her property, within one year of bankruptcy, with the intent to hinder, delay, or defraud a creditor.  Its cause of action against Maegan under 11 U.S.C. § 727(a)(2) is dismissed.

The Bank did not prove that the Balfours knowingly and fraudulently made a false oath in connection with a case under 11 U.S.C. § 727(a)(4).  This claim and cause of action against both Nolan and Maegan is dismissed.

Since the Court denied Nolan's discharge under section 727, it is not necessary to analyze the Bank's section 523 claims against Nolan.

The Bank did not meet its burden of showing Maegan's debt to it should be discharged under section 523(a)(2)(A) or (B).  These claims and causes of action are dismissed.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated:  January 24, 2020.

_____/s/ Shon Hastings_____
SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT